**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **RONALD K. HOOKS**, Regional Director of the Nineteenth Region of the National Labor Relations Board, for and on behalf of the **NATIONAL LABOR RELATIONS BOARD**, | Case No. 3:21-cv-268-SI<br><br>**AMENDED OPINION AND ORDER** |
| Petitioner, | |
| v. | |
| **HOOD RIVER DISTILLERS, INC.,** | |
| Respondent. | |

Anne Pomerantz, Irene Hartzell Botero, Sarah Ingebritsen, and Paul A. Thomas, NATIONAL LABOR RELATIONS BOARD, Region 19, 915 Second Avenue, Room 2948, Seattle, WA 98174. Of Attorneys for Petitioner.

Dennis E. Westlind, BULLARD LAW, 200 SW Market Street, Suite 1900, Portland, OR 97201; and Kristin Bremer Moore, TONKON TORP LLP, 888 SW 5th Avenue., Suite 1600, Portland, OR 97204. Of Attorneys for Respondent.

Noah T. Barish, MCKANNA BISHOP JOFFE, LLP, 1635 NW Johnson Street, Portland, OR 97209. Of Attorneys for *Amicus Curiae* Teamster Food Processors, Chauffeurs, Warehousemen, and Helpers, Local Union No. 670.

Noelle E. Dwarzski, BARLOW COUGHRAN MORALES & JOSEPHSON, P.S., 1325 Fourth Avenue, Suite 910, Seattle, WA 98101. Of Attorneys for *Amicus Curiae* Board of Trustees of the Oregon Processors Employees Trust Fund.

**Michael H. Simon, District Judge.**

Petitioner Ronald K. Hooks (Petitioner), Regional Director for Region 19 of the National

Labor Relations Board (NLRB or Board), filed a verified Petition and Amended Petition for and

on behalf of the Board. Petitioner requests preliminary injunctive relief against Hood River

Distillers, Inc. (HRD or Respondent) under Section 10(j) of the National Labor Relations Act (NLRA).[1] Petitioner sought an interim order pending the final disposition of the matters involved herein pending before the Board. The Court held a Show Cause and Evidentiary Hearing on April 2, 2021. Counsel for Petitioner, counsel for Respondent Hood River Distillers, Inc. (HRD or Respondent), and counsel for *amicus* Teamster Food Processors, Chauffeurs, Warehousemen, and Helpers, Local Union No. 670 (Union) presented argument. Counsel for *amicus* Board of Trustees of the Oregon Processors Employees Trust Fund (Trust Fund) relied on the Trust Fund's submitted brief. The Court considered the Amended Petition, evidence, and arguments of counsel, and issued an Opinion and Order on May 7, 2020, granting Petitioner's Amended Petition (ECF 53).

Respondent filed a motion to stay or amend the Court's injunction (ECF 56). The Court has considered Respondent's motion, Petitioner and the Union's briefs filed in response, and Respondent's reply. For the reasons discussed below, the Court denies Respondent's motion to stay. The Court grants Respondent's motion to amend in part, and issues this Amended Opinion and Order granting the Amended Petition. The Amended Order Granting Interim Injunctive Relief is filed concurrently herewith.

## BACKGROUND

### A.  The Parties

Petitioner is the Regional Director of Region 19 of the Board, an agency of the United States Government, and files this Petition for and on behalf of the Board. HRD is an importer, distiller, producer, bottler, and marketer of distilled spirits. It is located in Hood River, Oregon. HRD has approximately 75 employees.

---

[1] 29 U.S.C. § 160(j).

The Union is the designated exclusive collective-bargaining representative of HRD's 25 or so manufacturing and production employees (the Unit), who are all of HRD's employees except office and clerical employees, casual employees hired for no more than thirty calendar days, and supervisors as defined in the NLRA. The Union has represented this Unit of employees since around 1960. The Trust Fund is a joint labor management trust fund established under the NLRA and governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* The Trust Fund provided health and welfare benefits to HRD's employees performing work covered by HRD's bargaining agreement with the Union, through the Oregon Processor Employers Trust (OPET), until HRD moved employees to its own insurance plan on May 1, 2020.

**B. Procedural History**

Between May 6, 2020 and October 29, 2020, the Union filed three charges with Region 19 against Respondent in Cases 19-CA-260013, 19-CA-265595, and 19-CA-268290, alleging violations of §§ 8(a)(1), (3), and (5) of the NLRA.[2] On August 4, 2020, the Trust Fund filed a charge with the Region against Respondent in Case 19-CA-264083 alleging a violation of §§ 8(a)(1) and (5) of the NLRA. The charges filed by the Union and the Trust Fund were referred to Petitioner as Regional Director of Region 19.

Petitioner conducted a field investigation, during which all parties had an opportunity to submit evidence. Petitioner determined that there was reasonable cause to believe that Respondent engaged in unfair labor practices in violation of §§ 8(a)(1), (3), and (5) of the NLRA as alleged in the charges filed by the Union and the Trust. On December 1, 2020, Petitioner issued an Order Consolidating Cases, Consolidated Complaint and Notice of Hearing in Cases

---

[2] 29 U.S.C. §§ 158(a)(1), (3), and (5).

19-CA-260013, 19-CA-265595 and 19-CA-264083 (Consolidated Complaint), alleging that Respondent had engaged in unfair labor practices under §§ 8(a)(1), (3), and (5) of the NLRA. On December 15, 2020, Respondent filed an Answer denying the material allegations of the Consolidated Complaint.

On February 4, 2021, Petitioner issued an Order Further Consolidating Cases, Second Amended Consolidated Complaint and Notice of Hearing in Cases 19-CA-260013, 19-CA-265595, 19-CA-267920,[3] 19-CA-268290, and 19-CA-264083 (Second Consolidated Complaint), alleging that Respondent had engaged in further unfair labor practices under §§ 8(a)(1), (3), and (5) of the NLRA. On February 16, 2021, Respondent filed an Answer denying the material allegations of the Second Consolidated Complaint.

On February 24, 2021, Petitioner issued an Amendment to the Second Consolidated Complaint in Cases 19-CA-260013, 19-CA-265595, 19-CA-267920, 19-CA-268290, and 19-CA-264083 (Amendment). On March 2, 2021, Respondent filed an Answer denying the material allegations of the Amendment.

An administrative hearing on the allegations of the Second Consolidated Complaint, as amended, is scheduled to be held before an Administrative Law Judge (ALJ) of the Board beginning on May 25, 2021. The ALJ's decision, however, will not be final. *See* 29 C.F.R. § 102.45. Only the Board, after either adopting or rejecting the ALJ's decision, can provide relief. 29 C.F.R. § 102.48. Further, either party aggrieved by the Board's final order can obtain review of the order before the Ninth Circuit. 29 U.S.C. § 160(f). During this process to reach the Board's decision, to preserve the lawful status quo that existed before an employer's unfair labor practices, Congress accorded the Board authority to seek a temporary injunction pursuant to

---

[3] Petitioner is not pursuing relief in this Court for the allegations in this charge.

§ 10(j). *See* 29 U.S.C. § 160(j)[4]; *see also Frankl v. HTH Corp.* (*Frankl I*), 650 F.3d 1334, 1342 (9th Cir. 2011) (stating that "[a] Section 10(j) proceeding" is one "in which the Board seeks injunctive relief to protect the lawful status quo while litigation is pending").

The Court issued its Opinion and Order granting the Amended Petition on May 7, 2021. ECF 53. HRD filed its motion to stay or amend the Court's injunction on May 11, 2021. The parties completed briefing on that motion on May 24, 2021.

## C. Relevant Facts about the Labor Dispute[5]

HRD and the Union have been parties to a series of Collective Bargaining Agreements (CBAs), the most recent of which expired on February 28, 2019. The parties engaged in bargaining a new CBA from February 27, 2019, through April 23, 2020, when HRD declared that the parties had reached an impasse. Bargaining on behalf of HRD was HRD's Human Resources Manager Janene Sumerfield (Sumerfield); HRD's Vice President of Operations Donna Gaudreault (Gaudreault); HRD's Chief Financial Officer was Erica Mitchell (Mitchell); and HRD's outside labor counsel Kristin Bremer Moore (Bremer Moore) of Tonkon Torp, LLP. Bargaining on behalf the Union was Michael Beranbaum (Beranbaum), the Union's Secretary

---

[4] Section 10(j) provides: "The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."

[5] There are many facts relating to the parties' labor dispute, but the Court need not discuss all the relevant facts to decide the Amended Petition. The Court discusses the facts relevant to the Court's holding.

and Treasurer; Larry Kale (Kale), the Union Business Agent until August 2019; and Marcus Williams (Williams), the Union Business Agent from August 2019 until August 2020.

The parties engaged in six bargaining sessions between February 27, 2019 and March 30, 2020, and exchanged information and communications between sessions. HRD informed the Union that HRD needed to lower its costs, and thus that the most important issues for HRD in the bargaining process were lowering wages and moving the Unit to HRD's insurance plan and away from the OPET.

In March 2019, Kale repeatedly requested information from HRD about its then-existing CIGNA health insurance plan to have the Union's third-party administrator perform a plan comparison so the Union could evaluate the economic impact of changing insurance plans. HRD provided the last of the requested information on April 2, 2019.

Sumerfield repeatedly contacted Kale about scheduling additional bargaining sessions. Kale regularly responded that he was working on scheduling dates. For example, on March 21, 2019, Kale sent a letter that stated he was working on finding dates; on April 8, 2019, he sent an email that he was working on dates; and on May 1, 2019, he proposed several dates in June. The parties eventually scheduled sessions for June 24 and 25, 2019. At the June 24 and 25, 2019 bargaining sessions, the Union made a "what-if" proposal that included employees remaining in the OPET insurance but with various other Union concessions including a wage freeze for the life of the contract and other insurance and pay concessions. Sumerfield, Bremer Moore, and Gaudreault were present on behalf of HRD. Sumerfield stated that many, but not all, of HRD's Board of Directors had been contacted about the proposal and that HRD accepted the Union's proposal, pending approval by its Board of Directors. The parties ended the bargaining sessions and did not set any further bargaining, believing they had reached an agreement. The Union

notified HRD that the Union had a new business agent, Williams, who would be starting in August. HRD notified the Union on July 17, 2019, that HRD's Board of Directors rejected the Union's proposal.

The parties next met to bargain on September 27, 2019. At the September 27th session, HRD disclosed for the first time that it had changed insurance carriers from CIGNA to Blue Cross/Blue Shield in May 2019, one month after HRD had disclosed all of the plan information to the Union so it could make its plan comparison. HRD had not updated its disclosure when it made this plan change, had not provided this information to the Union during the June 24 and 25th bargaining sessions, and had not provided the new plan information before the September bargaining session. The Union asked for the new plan information so that the Union's third-party administrator could prepare a comparison with HRD's new plan. HRD also added in the September 2019 bargaining session a new request relating to access for the Union, including that the Union provide 24-hour advance notice for any visit and that management escort the Union throughout the facility. The Union notified HRD that it considered this provision regressive. The parties dispute whether the Union left bargaining during the September 27th session without notifying HRD. The Court finds the evidence more persuasive that the Union did not leave bargaining without notifying HRD.

On October 24, 2019, when HRD requested more bargaining dates, the Union responded that the third-party administrator had not yet completed the plan comparison. On November 1, 2019, HRD notified the Union that HRD's offer at the September 27, 2019 bargaining session was its "last and final offer" and the Union had until November 13, 2019 to accept that offer. On November 14, 2019, HRD declared that the parties were at an impasse and that HRD would implement its last and final offer on January 1, 2020, which was the date of open enrollment for

HRD's insurance plan. The Union responded that HRD had notified the Union on September 27th that HRD had a new insurance plan and the third-party administrator had not yet completed the plan comparison, and thus the parties were not at an impasse. HRD offered more bargaining dates, but the Union responded that it needed the plan comparison before it could schedule bargaining.

The Union received the plan comparison from its third-party administrator in late November 2019, in part because the person performing that comparison within the administrator's office became ill. The Union did not contact HRD to set a bargaining date.

On December 11, 2019, HRD again declared that the parties were at impasse and stated that it would implement its September 27, 2019 offer on January 1, 2020. The Union responded that it had received the plan comparison, was scheduling a meeting with its bargaining unit to go over the information, and would then be available for bargaining. The parties scheduled bargaining for January 16 and 31, 2020. The parties cancelled the January 16, 2020 session because of a snowstorm, and HRD cancelled the January 31, 2020 session. The parties agreed to meet on March 10, 2020.

HRD proposed using a federal mediator for the March session but the Union rejected that request. The parties met without a mediator. They reached several tentative agreements on March 10, 2020. At the end of the session, the Union proposed two options. Option A proposed agreeing to HRD's healthcare plan with a 6% wage increase to the Unit over the term of a three-year contract, which included one year of retroactive wage increases of 2% going back to 2019 and a 2% increase in both 2020 and 2021. The Union considered that moving to HRD's insurance was a significant concession because it had higher copays, deductibles, and out-of-pocket maximums. Option B proposed staying on the OPET health and welfare plan, but freezing

wages for the life of the contract as a concession to HRD. The parties agreed to meet on March 30, 2020.

On March 23, 2020, due to COVID-19, Oregon Governor Kate Brown issued Executive Order No. 20-12. That order closed many businesses, directed individuals to minimize non-essential travel, and closed government buildings. It also directed all private businesses (such as HRD and the Union) to "facilitate telework and work-at-home by employees, to the maximum extent possible. Work in offices is prohibited whenever telework and work-at-home options are available, in light of position duties, availability of teleworking equipment, and network adequacy." The order instructed that if telework is unavailable, a business must implement social distancing, including for "business-critical visitors." The order also stated that businesses that fail to comply with the Order will be closed until they show compliance. HRD continued to have its employees work in person at its Hood River facility.

The parties had a telephone bargaining session on March 30, 2020. Before that call, HRD had emailed its latest proposal. HRD's proposal added a fourth year to the contract and included the access restrictions first raised in the September session. It also eliminated eligibility for health insurance coverage for employees working less than 120 hours per month, which was around 4% of the Unit. HRD also explained at the March 30th bargaining session that the Unit had to be moved to HRD's health insurance by May 1, 2020, which was the close of the open enrollment period for HRD's health insurance plan.

The Union made a proposal in response to HRD's proposal, increasing the contract term to four years, accepting HRD's health insurance and higher deductible but countering with an increased medical reimbursement component, and proposing no pay raise the first year, 3% the second year, 3.25% the third year, and 3.5% the fourth year. The overall proposed pay raise

was 9.75% but with no raise the first year, which reduced the compounding effect of the wage increase when considering the first three years as compared to the previous three-year offer. HRD was dissatisfied with this offer, so the Union made another modified proposal without waiting for HRD's counterproposal. The Union's second proposal reduced the wage increase to 0% the first year, 2.75% the second year, 3% the third year, and 3.25% the fourth year. The total pay increase over four years was 9%, and the increase for the first three years was 5.75% with nothing in the first year. The Union also accepted HRD's proposed deductible amounts and medical reimbursement amounts.

The Union, however, asked HRD for information on its monthly cost per employee for HRD's health insurance plan. The Union wanted this information to gauge how much HRD would save by moving the Unit to HRD's insurance plan, for negotiations on wage proposals. HRD had provided this information to the Union on HRD's former CIGNA plan but had not yet provided this information after HRD switched to Blue Cross/Blue Shield.

At the end of the bargaining session on March 30th, Bremer Moore emailed Williams stating that she was attaching HRD's "last, final and best offer" and the company would not make any more concessions on wages. She also stated that the parties appeared to be at "loggerheads" with respect to the Union access (Article 1, Section 4) and 401k contribution (Article 8, Section 2) issues. She proposed that HRD would accept the Union's proposed text on the 401k contribution if the Union accepted HRD's text about Union access.

Williams responded to Bremer Moore that the Union now believed it made sense to bring in help from a federal mediator and that the parties should schedule an in-person mediation. Bremer Moore responded that with the uncertainties of COVID-19, waiting for in-person mediation was not a viable option and HRD was ready immediately to schedule a teleconference

with the mediator. Williams responded that given the Union's experience with the teleconference mediation that was just held, the Union would prefer an in-person mediation.

Bremer Moore replied that HRD believed the parties to be at an impasse. She stated that the Union moved on healthcare but that there was no movement on wages, 401k, or Union access (despite the Union's movement on wages during that day's negotiation). She stated that the request for in-person mediation was an unlawful and impermissible refusal to bargain and a delay tactic.

On March 31st, Williams responded that the Union disagrees that the parties are at an impasse and disagrees that the Union refuses to bargain. He reiterated that the Union stands ready to bargain with help from a mediator and believes that face-to-face bargaining is needed. He reminded Bremer Moore that the company previously has claimed impasse and threatened unilateral implementation of "last and best" offers, and that HRD's "continued take it or leave it style of bargaining is more harmful than helpful." He expressed concern that HRD was trying to provoke a labor dispute and engaging in bad-faith bargaining tactics.

Williams spoke with Julie Kettler (Kettler), the federal mediator, who appeared to support Williams in his desire for an in-person mediation, despite the fact that as of March 15, 2002, the Federal Mediation Conciliation Service (FMCS) had mandated the virtual attendance of its mediators.[6] At this early stage in the pandemic and the beginning of the shutdown, people did not fully understand the ramifications of the pandemic and believed that the shutdown would last only a few weeks. When Kettler spoke with Bremer Moore, however, Kettler appeared to support video or teleconference mediation and suggested that the Union agreed. On April 1, 2020 Bremer Moore proposed to Williams dates for virtual bargaining.

---

[6] This mandate remains in place.

On April 3, 2020, the Union posted a notice at HRD's facility. It was titled "Negotiations Update March 30, 2020" and explained the Union's perspective of the bargaining session of March 30, 2020. The Union stated:

> We will continue to Negotiate in Good Faith with your employer but unfortunately given the lack of respect they are showing you and your coworkers we are going to be seeking the assistance of a Federal Mediator. A Federal Mediator is brought in to assist the parties in reaching a settlement that is agreeable to all parties. Federal Mediators do not have the ability to force your bargaining team to agree to anything nor force your employer to agree to anything. They are there to help the parties move in the right direction.
>
> As soon as we are able to schedule negotiations, with the Federal Mediator present, we will let you know. However, it is probably likely the Mediator will not be available and willing to meet in person until after the State's shelter in place order is rescinded.

ECF 35 at 54.

After a few conversations with Kettler that appeared to be going one way with the Union and a different way with HRD, on April 9, 2020, the confusion reached a critical point. HRD understood that the Union agreed to virtual bargaining with the mediator and proposed dates to Williams. Williams contacted Kettler because he understood Kettler to support waiting for in-person mediation and that HRD knew the Union was waiting for FMCS to resume in-person mediations. Kettler admitted to Williams that she may have "messed up" in communicating to Bremer Moore that the Union was fine with video or teleconference mediation. Kettler then told Bremer Moore that the Union wanted in-person mediation. Soon after, Kettler retired and the parties began working with a new mediator, Ligia Velazquez (Velazquez).

After learning that the Union was still insisting on in-person mediation, on April 9, 2020, Bremer Moore emailed Williams stating that HRD would file an unfair labor practice charge against the Union and would stop collecting union dues on the expired contract if the Union

refused to bargain via video or teleconference. Williams responded by continuing to demand in-person bargaining. On April 10, 2020, HRD filed an unfair labor practice charge against the Union for bad-faith bargaining. The NLRB Office of Advice ultimately found that the Union "exhibited a sincere desire to reach agreement on a successor contract at all relevant times and did not evince a pattern of delay calculated to avoid reaching agreement on unfavorable terms or impasse." The Office of Advice dismissed the charge. HRD appealed, and the Office of Appeals denied HRD's appeal. On April 14, 2020, HRD provided the Union with the monthly per-employee cost information on the Blue Cross/Blue Shield plan the Union had requested at the March 30th bargaining session. On April 23, 2020, Bremer Moore sent a letter to Williams, summarizing the parties' bargaining history from HRD's perspective, again declaring impasse, and stating that HRD would implement its last, best, and final offer from March 30, 2020 on May 1, 2020. The Union responded the next day, denying that the parties were at impasse.

On April 29, 2020, the Union met with the Unit. The Union explained that HRD was claiming impasse, updated the Unit on bargaining, and explained that the Union wanted to bargain in person with a federal mediator present. The Unit authorized a strike if HRD unilaterally implemented its last and best offer.

On May 1, 2020, HRD implemented its last offer. HRD stopped paying premiums to the Trust Fund and started paying premiums to its insurer. It also adjusted the Unit's salaries and changed the Union's access to HRD. On May 6, 2020, the Union began an unfair labor practice strike, and all members of the Unit went on strike.

Beranbaum spoke with Velazquez about meeting in person outdoors, in a hotel room, or in the large conference room at HRD for mediation. Velazquez informed Beranbaum that she could not yet travel to Hood River from Seattle for an in-person mediation.

On June 30, 2020, Mitchell gave a television interview in which she stated that the Unit had been informed that they could be permanently replaced if they went on strike. On July 30, 2020, HRD posted a message on its website stating that it had hired 21 permanent replacements and that striking workers would only be recalled to work if open positions became available.

On August 26, 2020, the parties engaged in video bargaining facilitated by mediator Velazquez. The parties did not make progress. HRD's position was that its last offer was final and that it would not make further concessions. HRD refused to reinstate striking workers and agreed only to place them on a preferential rehire list.

On August 27, 2020, the Union presented a letter to HRD communicating the unconditional offer for all 25 striking employees to return to work as of September 1, 2020. HRD responded that it believed the striking employees were out on an economic strike and HRD would not reinstate the striking employees to their previous positions because HRD filled those positions with permanent replacement workers. HRD found two employees had violated HRD's policies during the course of the strike, and Petitioner does not dispute that those two employees are not eligible for rehire. HRD placed most of the workers on a preferential list for rehiring, based on seniority. HRD has thus far offered to recall about nine striking employees. Seven have returned to work, five of whom returned to different positions at lower rates of pay. Two declined to return to work because one had retired and one had accepted employment elsewhere. HRD's refusal to reinstate the striking workers has caused serious financial difficulties for the workers and caused some of them to lose healthcare coverage or struggle with inferior coverage. Several of the striking workers have serious medical needs.

## LEGAL STANDARDS

The Court may grant Petitioner's "request for a preliminary injunction under Section 10(j) of the NLRA so long as the Director establishes that he is likely to succeed on the

merits of the underlying unfair labor practice claims, that irreparable harm is likely in the absence of preliminary relief, that the balance of hardships tips in his favor, and that an injunction is in the public interest." *Frankl ex rel. NLRB v. HTH Corp.* (*Frankl II*), 693 F.3d 1051, 1062 (9th Cir. 2012) (citing *Frankl I*, 650 F.3d at 1355). "[S]erious questions going to the merits," can support injunctive relief if the balance of the equities "tips sharply" in favor of an injunction, and the government shows the other two factors. *Frankl I*, 650 F.3d at 1355 (quoting *All. for the Wild Rockies v. Cotrell*, 632 F.3d 1127, 1131-34 (9th Cir. 2011)). Additionally, the Court "must evaluate the traditional equitable criteria through the prism of the underlying purpose of section 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power." *Id.*

To meet his burden to show likelihood of success on the merits, Petitioner "must show a 'probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred and that [the Ninth Circuit] would grant a petition enforcing that order, if such enforcement were sought.'" *Frankl II*, 693 F.3d at 1062 (quoting *Frankl I*, 650 F.3d at 1355). Petitioner meets this burden "if he can produce some evidence to support the unfair labor practice charge, together with an arguable legal theory." *Id.* (simplified). "[A] conflict of evidence does not preclude the Regional Director from making the requisite showing for a § 10(j) injunction." *Scott ex rel. NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652, 662 (9th Cir. 2001) (abrogated on other grounds).

"[I]n evaluating the likelihood of success, 'it is necessary to factor in the district court's lack of jurisdiction over unfair labor practices, and the deference accorded to NLRB determinations by the courts of appeals.'" *Frankl I*, 650 F.3d at 1356 (quoting *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 460 (9th Cir. 1994)). Indeed, "even on an issue of law, the district court

should be hospitable to the views of the General Counsel, however novel." *Id.* (quoting *Miller*, 19 F.3d at 460).

**DISCUSSION**[7]

## A.  Likelihood of Success on the Merits

The parties argue that "linchpin" issue is whether Respondent's unilateral implementation of its last and final offer was lawful, whether after impasse or an exception to impasse. The resolution of all issues follow from this decision. Thus, the Court first discusses whether Petitioner is likely to succeed on his claim that Respondent violated § 8(a)(5) of the NLRA. Additionally, because the resolution of Petitioner's § 8(a)(1) claim follows the resolution of his § 8(a)(3) claim, the Court addresses those claims in that order.[8]

### 1.  Alleged Violations of § 8(a)(5) of the NLRA

Petitioner argues that Respondent violated § 8(a)(5) of the NLRA by failing to bargain in good faith to impasse and instead unlawfully declaring an impasse and unilaterally implementing new terms. When parties are engaged in negotiations for a new CBA, in general, "an employer's obligation to refrain from unilateral changes extends beyond the mere duty to give notice and an opportunity to bargain; it encompasses a duty to refrain from implementation at all, unless and until an overall impasse has been reached on bargaining for the agreement as a whole." *Bottom Line Enters.*, 302 NLRB 358, 374 (1991), *enf'd*, 15 F.3d 1087 (9th Cir. 1994) (footnote omitted).

---

[7] Any argument of the parties not specifically addressed in this Opinion and Order is rejected.

[8] The parties do not dispute the Court's jurisdiction. The parties also do not dispute many of the statutory elements under the NLRA, including that Respondent was engaged in interstate commerce, Respondent met the minimum thresholds for gross revenues and goods in commerce, Respondent is an employer under the NLRA, and the Union is a labor organization under the NLRA. Thus, the Court finds that Petitioner will prove those elements before the Board for all claims.

"It is well established that an employer violates Section 8(a)(5) if it unilaterally modifies the terms or conditions of employment without bargaining to an impasse." *Rubin v. Hosp. of Barstow, Inc.*, 2016 WL 4547152, at \*4 (C.D. Cal. Aug. 29, 2016) (citing *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198 (1991) and *NLRB v. Auto Fast Freight, Inc.*, 793 F.2d 1126, 1129 (9th Cir. 1986)).

"The Board has defined impasse as the point in time of negotiations when the parties are warranted in assuming that further bargaining would be futile." *Southcoast Hosps. Grp., Inc. & Mass. Nurses Ass'n*, 365 NLRB No. 100 (June 28, 2017). In determining whether impasse has been reached, the NLRB considers "[t]he bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, [and] the contemporaneous understanding of the parties as to the state of negotiations." *Taft Broad. Co.*, 163 NLRB 475, 478 (1967), *enf'd* 395 F.2d 622 (D.C. Cir. 1968). "It is well settled that the party asserting the existence of a bargaining impasse bears the burden of proof to demonstrate an impasse." *In Re Richmond Elec. Servs., Inc.*, 348 NLRB 1001, 1004 (2006).

Since on or about May 1, 2020, Respondent has failed to continue in effect the terms and conditions of the CBA by: (1) failing or refusing to pay the Unit the wage rates established in the CBA; (2) giving itself the ability to limit contributions to the Unit employees' retirement plan; (3) failing or refusing to make contributions to the Unit's health and welfare plan managed by the Trust Fund; and (4) limiting the Union's right to access Respondent's facility. These subjects relate to the wages, hours, and other terms and conditions of employment of the Unit and are mandatory subjects for the purposes of collective bargaining. *See, e.g., Frankl II*, 693 F.3d at 1064 (stating that when an employer has a past practice of providing union access, it becomes

a term and condition of employment that is subject to bargaining); *MacKillop v. Lowe's Mkt.,*

*Inc*, 58 F.3d 1441, 1446 (9th Cir. 1995) (stating that "the essential purpose of section 515 would

be far too easily circumvented if an employer could unilaterally stop making contributions to an

employee benefit plan as required by the CBA and the plan documents, and defend such action

on grounds that it provided some form of substitute coverage for its own employees" and

concluding that "the employer's obligations to the Plans continued until the NLRB ruled that the

CBA had no force and effect"); *S.W. Adm'rs, Inc. v. Rozay's Transfer*, 791 F.2d 769, 776 (9th

Cir. 1986) ("This obligation to maintain the status quo during continuing negotiations

encompasses the obligation to continue making pension fund contributions. The employer must

maintain the benefits and conditions of employment under the expired agreement until the parties

negotiate a new agreement or bargain in good faith to impasse.") (simplified).

Respondent argues that the parties were at impasse on April 23, 2020. Petitioner meets

his burden before this Court if he provides "some evidence" that Respondent will not meet its

burden to show impasse before the Board, under the *Taft* factors. Petitioner easily meets this

burden.

For the first *Taft* factor, the parties' have a history of bargaining to successful CBAs. For

this CBA, the parties' bargaining shows that the parties made significant movement during the

bargaining process, particularly in March 2020. The parties were poised to make additional

movement when Respondent first declared that the parties were at "loggerheads" (March 30th)

through its final, formal declaration of impasse (April 23rd). Indeed, the Union was waiting for

more cost information from Respondent so the Union could evaluate its current proposal on

wages. The Union did not get that information until April 14, 2020. This evidence belies

impasse. *See Bottom Line Enters.*, 302 NLRB at 374 (finding that no valid impasse existed when the parties were "poised for movement" ).

The Union also had replaced its negotiator with a new negotiator, Williams, in August 2019, and in the September 2019 session Respondent gave its late notice about its change in health insurance carrier, knowing how important the health insurance plan comparison was to the Union from the March 2019 demands for the CIGNA plan. With the delay from the third-party administrator and the cancellations of the January sessions, Williams could not begin seriously negotiating on the important issues until the March 2020 sessions, in which the Union made significant concessions. This does not support a finding of impasse. *See, e.g.*, *Grinnell Fire Prot. Sys. Co.*, 328 NLRB 585, 596 (1999), *enf'd* 236 F.3d 187 (4th Cir. 2000) (noting that when, among other factors, a new negotiator was substituted, "the lack of a significant bargaining history would dictate giving the parties a fuller opportunity to effect an agreement than occurred here").

There also is at least "some evidence" that the parties bargained in good faith with a genuine desire to reach an agreement. Respondent argues that the Union engaged in significant delays, but those delays are attributable to waiting for information from Respondent, waiting for information from the third-party administrator, scheduling conflicts, a change in bargaining personnel, and Respondent's failure to tell the Union for four months that Respondent had changed its health insurance plan. Although the Union could have been more responsive to Respondent's communications, Petitioner has met its burden on this issue. There is more than "some evidence" that the Union's delays were not intended to avoid reaching agreement on unfavorable terms or to avoid impasse. The Union attended multiple bargaining sessions,

responded to numerous communications by Respondent, exchanged significant information with Respondent, and made significant concessions to Respondent.

Respondent also challenges the Union's insistence on in-person bargaining with a federal mediator at the beginning of the pandemic as a bad-faith delay. The Court disagrees. Generally, the Board holds that "face-to-face negotiations between the bargaining principals is an elementary and essential condition of bona fide bargaining." *Redway Carriers, Inc.*, 274 NLRB 1359, 1377 (1985) (quotation marks omitted); *see also Success Vill. Apartments*, 347 NLRB 1065, 1080 (2006) ("It is elementary that collective bargaining is most effectively carried out by personal meetings and conferences of parties at the bargaining table. . . . An employer may not insist that negotiations be conducted by phone or by mail."). The pandemic changed many basic facets of life and legal proceedings, including in-person court proceedings and many other in-person activities. The Union's demands, however, were made at the beginning of the pandemic. At that point, it was not clear how long the COVID-19 lockdown would last, and the initial thinking was that it would be a matter of weeks. The Union demanded in-person bargaining with a mediator for 24 days at the beginning of the pandemic (March 31-April 23) before Respondent declared an impasse. Petitioner meets his burden to show that there is at least "some evidence" that it was not unreasonable for the Union to believe at that time that it would shortly be able to exercise its usual right to in-person bargaining.

Respondent argues that the that the Union "knew" that Governor Brown's Executive Order and FMCS policy precluded in-person bargaining based on the Notice the Union posted on April 3, 2020. The Court does not construe the Notice as definitively stating as much. The Notice stated that it was "probably likely" that the mediator could not join in person until after the state

lockdown. Regardless, the point is that it was not unreasonable for the Union to believe on April 3, 2020 that the lockdown would only last a few weeks and wait for in-person bargaining.

Respondent also argues that the NLRB Office of General Counsel Memorandum GC 20-14 "Summaries of Advice Merit Determinations Related to Coronavirus Disease 2019 Issues" (Memo 20-14) shows that the Union unreasonably delayed bargaining by requesting in-person mediation in April 2020. Memo 20-14 was issued on September 18, 2020, *after* the parties had restarted bargaining and well after the Union demanded in-person mediation in April 2020. Memo 20-14 could not offer any guidance to the Union in April 2020 on whether demanding in-person bargaining at the beginning of the pandemic was reasonable. The Court finds that there is at least "some evidence" that after engaging in multiple in-person bargaining sessions and having a negative experience with a telephone bargaining session on March 30, 2020, it was not unreasonable for the Union in April 2020 to demand to wait for what it believed would be only a matter of weeks until in-person bargaining could resume.

Additionally, Memo 20-14 offers only a very brief outline of the underlying cases, for which the Office of Advice authorized a complaint to be filed but for which the complaints were not yet public because the cases were ongoing. The complaints had not been decided by an ALJ or the Board. Indeed, in the underlying case the ALJ or Board may dismiss the charges or find in favor of the employer. Further, the facts as briefly summarized also appear distinguishable. In Memo 20-14, the Office of Advice approved the filing of a complaint where an employer "failed to bargain for an extended period of time"[9] and then failed either to bargain or to respond to the union's email from mid-March to mid-May. The General Counsel determined that the employer

---

[9] Although not apparent from the brief case description in Memo 20-14, in his Reply Petitioner clarifies that that the employer refused to bargain in any manner for three months and refused to respond to the union for two months.

could not use the pandemic as an excuse to fail to bargain. Unlike the employer in the relevant Memo 20-14 case, the Union had bargained for months, including on March 30, 2020 by telephone, and was communicating with Respondent. The time at issue is 24 days, from March 31st after the last telephone bargaining session until April 23rd when Respondent declared impasse. During that time, the Union was waiting for information from Respondent (that the Union received April 14th) and demanding to wait until the lockdown ended and in-person bargaining could resume, at a time when it was not unreasonable to believe that would not be a long period. Memo 20-14 does not support a finding that the Union unreasonably delayed bargaining under these facts.

For the third *Taft* Factor, the length of bargaining, although spread over 15 months, encompassed only six sessions. This also supports the Petitioner's position that Respondent will fail to prove impasse before the Board. *See Bottom Line Enters.*, 302 NLRB at 374 (finding no impasse where parties had only met six times and union was in process of readying multiple counterproposals at final session).

The fourth *Taft* factor weighs in favor of Petitioner. There was significant movement by the Union in the two March 2020 bargaining sessions relating to the two most important issues— health care and wages. Indeed, the parties appeared to have reached agreement on health care and the Union made significant concessions on wages, even bargaining against itself without waiting for Respondent's counteroffer. In Respondent's March 30th email describing the parties as at "loggerheads" and subsequent notice of impasse, Respondent stated that the parties could not agree on 401k contributions and Union access. Respondent, however, offered to accept the Union's 401k contribution proposal if the Union accepted Respondent's Union access proposal. Respondent's communication in itself shows that there was room to bargain on those two issues.

Further, those two issues were not the issues Respondent had described as the most important issues. The most important issues were healthcare and wages, and on those issues the Union had offered significant concessions during the March sessions. "Given this clear indication of the Union's flexibility on the major issue in negotiations, [Respondent] 'might reasonably be required to recognize that negotiating sessions might produce other or more extended concessions. This is the purpose of collective bargaining.'" *Anderson Enters*, 329 NLRB 760, 772 (1999) (quoting *NLRB v. Webb Furniture Corp.*, 366 F.2d 314, 316 (4th Cir. 1966)); *see also Grinnell Fire*, 328 NLRB at 598 ("[T]he substantial concessions and changes in the nature of the health and welfare and pension benefits the [Employer] was seeking, warranted more extensive discussion than these truncated negotiations permitted." (quotation marks omitted)); *id.* at 586 ("Where, as here, a party who has already made significant concessions indicates a willingness to compromise further, it would be both erroneous as a matter of law and unwise as a matter of policy for the Board to find impasse merely because the party is unwilling to capitulate immediately and settle on the other party's unchanged terms. Such a doctrine would encourage rigid, inflexible posturing in place of the give-and-take of true bargaining. Further, even assuming arguendo that the [Employer] has demonstrated it was unwilling to compromise any further, we find that it has fallen short of demonstrating that the Union was unwilling to do so."). This factor weighs strongly against a finding of impasse.

For the final *Taft* factor, although Respondent expressed a contemporaneous view that further bargaining was futile and the parties were at impasse, Respondent had repeatedly expressed this view yet bargaining continued. This casts doubt on the reliability of Respondent's statement. Further agreement between the parties had been reached after Respondent declared impasse in November and December, 2019. Additionally, "[t]he Respondent's self-serving view

that impasse had been reached is not determinative." *Wycoff Steel*, 303 NLRB 517, 523 (1991). The Union vehemently denied that the parties had reached impasse. Thus, this factor weighs against a finding of impasse.

Respondent argues that even if the parties were not at impasse, the exception to impasse for a union's delay or refusal to meet and bargain justifies Respondent's unilateral action. The Ninth Circuit explains that under the "exception to impasse" rule, an employer may unilaterally implement proposals without first bargaining to impasse when three factors are met: "[1] upon expiration of a collective bargaining agreement, [2] the union has avoided or delayed bargaining, and [3] the employer has given notice to the union of the specific proposals the employer intends to implement." *NLRB v. Auto Fast Freight, Inc*., 793 F.2d 1126, 1129 (9th Cir. 1986). The parties only dispute the second factor. As discussed above, however, the Union did not avoid or delay bargaining.

The cases cited by Respondent to support exception to impasse are distinguishable. In *AAA Motor Lines, Inc.*, an employer tried to negotiate terms with a union before the termination of a contract, but the union refused to meet and negotiate at all. 215 NLRB 793, 793-94 (1974). Here, the Union repeatedly met with Respondent and made significant concessions to meet Respondent's demands. Respondent's reliance on *M&M Contractors*, is similarly misplaced because in that case the Board again relied on a union completely ignoring an employer's request to negotiate for seven months. 262 NLRB 1472 (1982).

Finally, Respondent's reliance on *Southwestern Portland Cement Co.* as "dispositive" lacks merit. 289 NLRB 1264 (1988). That case involved a union whose representative set a meeting and then did not show up and sent different representatives with no knowledge of the company's offer and no authority to bargain. When the employer declared impasse, the union

representative set another meeting for 10 days later, but then was unavailable. The union reschedule for a few days later. At the last minute, the union insisted on including a federal mediator, knowing that one would not be available at the last minute over the Labor Day holiday weekend. The ALJ found the "dispositive facts" were the union representative's "absence, his failure to educate the committee on Respondent's offer, the resulting bargaining illiteracy of the union committee, and its function of merely obtaining a copy of the proposal and adjourning," which led to the union engaging "only in a pro forma ritual." *Id.* at 1277. Respondent argues that the Union's insistence on in-person mediation is the same as the union's last-minute insistence on the addition of a federal mediator over a holiday weekend in *Southwestern Portland Cement*, and was done for purposes of delay. As discussed above, the Court disagrees. The Court finds that Petitioner has met his burden to show that the Union's demand for in-person bargaining, at the beginning of the pandemic when it was not clear how long the pandemic would last and when it was reasonable to believe it would only be a matter of weeks, was not an unreasonable delay. Respondent also argues that the Union's agreement to use the federal mediator was pretextual, but the evidence does not support such a contention. The parties were exchanging information and making progress through the March 2020 sessions and it was not unreasonable for the Union to believe that the parties could reach agreement on their own. Then the Union made numerous concessions during the two March 2020 bargaining sessions, even bargaining against itself when Respondent did not make any counter offer, to no avail. The Union finally reached a point of agreeing that a federal mediator was needed.

The facts in *Southwestern Portland Cement* are not present in the parties' bargaining history. The Union did not schedule bargaining sessions and fail to show, show unprepared, or make impossible demands at the last minute before a scheduled session.[10]

### 2. Alleged Violations of § 8(a)(3) of the NLRA

Petitioner alleges that Respondent's failure to reinstate the striking workers after the unconditional offer to return to work violated § 8(a)(3). Respondent argues that the strike was an economic strike and not an unfair labor practices strike. Strikers who have been engaging in an unfair labor practices strike are entitled to reinstatement to their former jobs even if the employer has hired replacements, and a refusal to reinstate those strikers violates § 8(a)(3) of the NLRA.

---

[10] Although Respondent's Brief cited *Jefferson Smurfit Corp.*, 311 NLRB 41 (1993), only for the general proposition that the Board has long recognized the exception to impasse rule, in Respondent's motion to amend it cites *Jefferson Smurfit* to argue that the Court should apply the exception to impasse. The facts in *Jefferson Smurfit*, however, are distinguishable. In that case the union started bargaining in September stating that it would not agree to a change in health care or pay premium. It did not make any counter offers on those issues for 14 bargaining sessions and the employer had to bargain against itself. On the 14th session in February the union made a list of demands for information, some of which the employer had already provided, and without explanation why the union waited five months to request the information or how the information was relevant. The employer made its best and final offer in that February session. The union did not advise the employer of the status of the best and final offer after the February session, such as whether the union voted on it. The union did not ask to meet about the offer or submit any counter proposal. The employer locked out the union employees. Only then did the union request additional bargaining sessions and agree to negotiate on the key issues of premium pay and medical insurance. The ALJ found that the employer legitimately found impasse or a bad faith refusal to bargain because "[t]he Union had repeatedly resisted efforts to meet more frequently; had repeatedly refused to address key employer proposals pertaining to premium pay buyout and comprehensive medical insurance which had been on the table since September 29; and had belatedly and in bad faith advanced a detailed information request for purposes of delay." *Id.* at 60. Here, although there were scheduling delays caused by both parties, the Court has found they were not unreasonable. Further, the Union did not refuse to address key issues of pay and insurance and, to the contrary, made significant concessions on those issues, and the Union timely made its requests for relevant information. The Union also immediately informed Respondent about the Union's position on Respondent's "last and final" offer and immediately requested additional bargaining, agreeing to Respondent's earlier request for the assistance of a federal mediator. The Union continually communicated with Respondent and the mediator—the dispute was about in-person versus virtual mediation, which the Court has already addressed.

"It is well established that a work stoppage is considered an unfair labor practice strike if it is motivated, at least in part, by the employer's unfair labor practices, even if economic reasons for the strike were more important than the unfair labor practice activity. . . . [T]here must be a causal connection between the two events." *In Re Golden Stevedoring Co., Inc.*, 335 NLRB 410, 411 (2001). Petitioner has shown a likelihood of success that the Board will conclude that the Unit's strike was an unfair labor practices strike and not an economic strike.

The Unit met with the Union days after Respondent declared impasse and stated it would unilaterally implement its last and best offer, and two days before Respondent was set to begin that implementation. The Unit authorized a strike if Respondent unilaterally implemented changes. The Union began the strike five days after Respondent implemented the changes. There is at least "some evidence" that the strike occurred, at least in part, in response to Respondent's declaration of impasse and unilateral implementation of new terms and conditions of employment. Thus, Petitioner has a likelihood of success on its claim that Respondent violated § 8(a)(3) in failing to reinstate the striking workers.

### 3. Alleged Violations of § 8(a)(1) of the NLRA

Petitioner alleges that Mitchell's statement on television on June 30, 2020, and Respondent's statement on its website on July 30, 2020, about permanently replacing the striking workers were violations of § 8(a)(1). An employer's statement violates § 8(a)(1) of the Act if "it has a reasonable tendency to interfere with, restrain or coerce the employees in the exercise of protected rights." *Joseph Chevrolet, Inc.*, 343 NLRB 7, 9 (2004), *enf'd.* 162 F. App'x 541 (6th Cir. 2006). Because the Court has found that Petitioner has a likelihood of success in proving to the Board that the strike was an unfair labor practices strike, Petitioner has a likelihood of success on this claim as well. Even though Respondent believed the Union was engaged in an economic strike, Respondent needed to clarify in its statement that it could only hire permanent

replacements if the strike was an economic strike and not if it was an unfair labor practices strike. *See Grinnell Fire Prot. Sys. Co. v. NLRB*, 236 F.3d 187, 201 (4th Cir. 2000) ("Because the ALJ concluded that the Union's strike was an 'unfair labor practice' strike—in which case the striking employees would have the right to be reinstated—the ALJ also found that Grinnell's letter threatened the employment status of the strikers by implying that they could be permanently replaced. That is, Grinnell's letter was threatening because it did not specify that Grinnell could hire permanent replacements only in the event of an 'economic' strike. The ALJ's conclusion was correct, and we will enforce the Board's Order in this regard."); *see also NLRB v. Kentucky Tennessee Clay Co.*, 179 F. App'x 153, 161 (4th Cir. 2006) ("Similarly here, we must affirm the Board's finding that Penner's statement was unlawful because, like the letter in *Grinnell*, it implied that the strikers could lose their jobs on a permanent basis without qualification. The statement failed to distinguish, as it must, between an 'economic' strike, in which an employer can hire permanent replacements, and an 'unfair labor practice' strike, in which the employees retain the right to reinstatement."); *Pennant Foods Co.*, 347 NLRB 460, 469-70 (2006) ("In the instant matter, Toporovsky, Borukhovich, Straba, Patel, and others were engaged in an unfair labor practice strike. As the letter threatens them with possibly being permanently replaced it was an unlawful threat in violation of Section 8(a)(1) of the Act. . . . The Respondent violated Section 8(a)(1) of the Act by threatening the unfair labor practice strikers with permanent replacement if they refused to abandon the strike."); *Cent. Valley Meat Co.*, 346 NLRB 1078, 1088 (2006) ("Threatening unfair labor practice strikers with job loss as a consequence of a strike or by permanent replacements as was done here certainly conveys the message that they would be terminated and violates Section 8(a)(1) of the Act."); *In Re Sierra Bullets, LLC*, 340 NLRB 242, 249 (2003) ("Respondent, by threatening its employees with

permanent replacements if they continue their unfair labor practice strike, has engaged in conduct in violation of Section 8(a)(1) of the Act.").

## B. Irreparable Harm

Petitioner argues that Respondent's conduct threatens irreparable harm to the national labor policy of encouraging good-faith collective bargaining that is embodied in § 1 of the NLRA, the employees' right to organize under § 7 of the NLRA, and the efficacy of the Board's ultimate remedial order. The NLRA gives employees the right to concerted action and to strike. Discrimination against strikers is "destructive of important employee rights." *NLRB v. Fleetwood Trailer Co., Inc.*, 389 U.S. 375, 380 (1967).

Petitioner also argues that Respondent's refusal to reinstate the striking workers sends the message to workers that exercising protected rights imperils their job, and keeps union workers out of the workplace during the ongoing labor dispute. The remaining employees will understand that union and protected concerted activity will likely result in their discharge and that they must wait years to have their rights vindicated. Thereafter, Respondent's retaliatory message will be impossible to erase and the absence of employee support will deprive the Union of the leverage it needs to bargain effectively on the Unit's behalf, both while the case is pending before the Board and when the final order issues. Petitioner asserts that interim reinstatement of the strikers is just and proper to erase that chilling message and ensure that the Unit remains comprised of the Union's core supporters during this ongoing labor dispute. Petitioner points out that an employee has petitioned to decertify the Union, showing that Respondent's conduct already has had a chilling effect on the Union's support.

Respondent argues that Petitioner fails to provide evidence that Respondent's alleged unlawful labor practices have had a "tangible impact" on employees' confidence in the Union. The Court disagrees, finding that the petition to decertify the Union is evidence of a tangible

impact. The Court also finds that the cases cited by Respondent are distinguishable. Those cases did not involve an employer who unilaterally implemented significant new terms and conditions and refused to reinstate the entire bargaining unit. *See Diaz v. Pro. Transp., Inc.*, 996 F. Supp. 2d 1215 (M.D. Fla. 2014) (involving the breakdown of bargaining, with no unilateral implementation of terms, strike, or replacement hires); *Hirsch v. Corban Corps., Inc.*, 949 F. Supp. 296 (E.D. Pa. 1996) (addressing a challenge to the termination of a single employee, which the court found was lawful and not based on union animus, and where employee was not a union negotiator and his reinstatement was not needed to preserve the status quo); *Schaub v. Detroit Newspaper Agency*, 984 F. Supp. 1048 (E.D. Mich. 1997), *aff'd sub nom. Schaub v. Detroit Newspaper Agency*, 154 F.3d 276 (6th Cir. 1998) (finding that the failure to grant injunctive relief would not erode union support or frustrate the Board's remedial powers by creating impediments to bargaining because the strike had been ongoing for two and one-half years and the parties had negotiated throughout that time with no success).

Considering the conduct and alleged harm in this case, the Court agrees with Petitioner and finds persuasive the many cases cited by Petitioner. *See, e.g.*, *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1192 (9th Cir. 2011) ("[A] delay in bargaining weakens support for the union, and a Board order cannot remedy this diminished level of support."); *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 856-57 (5th Cir. 2010) (affirming the district court's findings that the failure to reinstate strikers was "a direct cause" of loss of union support and led to the replacement of "large nucleus" of union supporters and that interim reinstatement preserves the lawful status quo by "returning the workforce to pre-strike level of Union support"); *E. Bay Automotive Council v. NLRB*, 483 F.3d 628, 634 (9th Cir. 2007) (affirming bargaining order and stating that "both logic and precedent dictate that unilateral action with respect to wages is likely

to have a long-lasting effect on employee support for a union because each paycheck reminds them of the likely irrelevance of the union"); *Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 239 (6th Cir. 2003) (agreeing with the district court that termination of strikers "would have an inherently chilling effect on other employees" and interim reinstatement was "just and proper"); *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996) ("Meanwhile, the employees remaining at the plant know what happened to the terminated employees, and fear that it will happen to them."); *Portland Willamette Co. v. NLRB*, 534 F.2d 1331, 1334 (9th Cir. 1976) (determining that "permanent discharge for participation in union activities" creates "visible and continuing obstacles to the future exercise of employee rights"); *Cowen v. Star Fisheries, Inc.*, 2017 WL 2111413, at *3 (C.D. Cal. 2017) (finding that strikers "must be reinstated so that they will provide their support to the Union and bargaining power will be restored"); *see also* ECF 2 at 27-29 nn. 34-42 (citing more cases).

Respondent also argues that the alleged harm is not imminent because the ALJ will be reviewing this case within months. The ALJ's opinion, however, will not be final and will not provide any relief to the Union or striking workers. Not until the Board issues its opinion would Petitioner's requested relief be possible.

Respondent further argues that Petitioner delayed in requesting injunctive relief, which counsels against providing the requested relief. The Court disagrees that Petitioner's alleged delay precludes injunctive relief. The Ninth Circuit explains "that delay by itself is not a determinative factor in whether the grant of interim relief is just and proper. The factor of delay is only significant if the harm has occurred and the parties cannot be returned to the status quo or if the Board's final order is likely to be as effective as an order for interim relief." *McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 965 (9th Cir. 2010) (simplified). The parties can be

returned to the status quo by Petitioner's requested injunctive order. A final order, which likely would not be issued for at least one year, is unlikely to be as effective, particularly because striking employees who Respondent has refused to reinstate will likely be forced to find employment elsewhere.

Petitioner argues that Respondent's alleged unlawful labor practices are causing irreparable harm to the individual workers, who have lost health care coverage and wages. Respondent replies that harm to individual workers is not cognizable in a 10(j) action, citing *Hirsch*, 949 F. Supp. at 303. Respondent, however, misunderstands that when workers suffer significant financial and medical harms, which cannot be remedied with a later monetary award, it adversely affects a union's ability to protect the collective bargaining rights of the workers. Many courts have found irreparable harm based on harm to individual workers. *See, e.g.*, *Paulsen v. All Am. Sch. Bus Corp.*, 967 F. Supp. 2d 630, 644 (E.D.N.Y. 2013) (describing the financial emotional harm to the individual workers and explaining that "[t]hese types of *ongoing* financial and emotional hardships to the union members, and their resulting antagonism toward the union caused by the implementation of the best and final offer, adversely affects the union's ability to protect the collective bargaining rights of its members and cannot be remedied by money damages awarded only after a final decision" (emphasis in original)); *Paulsen v. Renaissance Equity Holdings, LLC*, 849 F. Supp. 2d 335, 359-60 (E.D.N.Y. 2012) ("When employees have lost healthcare as a result of an unlawful lockout, an injunction ending the lockout is 'just and proper' to prevent irreparable harm to the employees. . . . Furthermore, many of the locked-out employees reside at Flatbush Gardens and have been unable to make their rent payments. . . . It would be difficult, if not impossible, to calculate damages for the time an employee and his family spent homeless; a preliminary injunction is therefore 'just and proper'

to prevent the employees from being evicted."); *Mattina v. Kingsbridge Heights Rehab. & Care Ctr.*, 2008 WL 3833949, at *25 (S.D.N.Y. Aug. 14, 2008), *aff'd*, 329 F. App'x 319 (2d Cir. 2009) ("Third, and more specifically, insofar as Kingsbridge's unfair labor practice of failing to meet its obligations to the Funds has directly led to the termination of health coverage for the Employees, the threat of irreparable harm to the Employees is tragically obvious."); *accord Coffman v. Queen of Valley Med. Ctr.*, 895 F.3d 717, 730 (9th Cir. 2018) ("The Director also established a likelihood of irreparable harm for the discrimination claim. Such harm includes economic and non-economic benefits to employees."); *Small*, 661 F.3d at 1191 (concluding that when "employees are denied the opportunity to achieve the economic benefits that a CBA can secure for workers," particularly wages, it is irreparable harm).

Finally, Respondent argues that the harms argued by Respondent are monetary and thus not irreparable. The Ninth Circuit has rejected this argument:

> This harm is likely to be irreparable because the Board generally does not order retroactive relief, such as back pay or damages, to rank-and-file employees for the loss of economic benefits that might have been obtained had the employer bargained in good faith. Moreover, even if the Board did order such relief, monetary damages would not make the employees whole, because the value of the right to enjoy the benefits of union representation is immeasurable in dollar terms once it is delayed or lost.

*Small*, 661 F.3d at 1191-92 (9th Cir. 2011) (simplified).

## C. Balancing the Equities

The Court's "determination that the Regional Director [has] shown likely irreparable harm to the collective bargaining process [means] that there [is] also considerable weight on his side of the balance of the hardships." *Id.* at 1196 (quoting *Frankl I*, 650 F.3d at 1365).

Respondent is merely being required to return to the status quo— reinstate its experienced

workforce, negotiate in good faith from the same position as before it declared impasse, and "follow the ordinary obligations of an employer under the law." *Id.*

Respondent also argues that some of the replacement workers will lose their jobs and if Respondent is ultimately victorious those employees will not get back pay, while the striking workers would ultimately get back pay. The striking workers, however, have demonstrated that they currently are suffering irreparable harm because of the devastating financial and medical effects of Respondent's failure to reinstate the striking workers. *See Paulsen*, 967 F. Supp. 2d at 646 ("Because Local 1181 members are incurring ongoing financial and emotional harm, which in turn damages the union and the collective bargaining process, the public interest and the balance of the equities in this case will be served by granting the injunctive relief sought by petitioner[.]" (citation omitted)). Further, "[t]he rights of improperly discharged employees, assuming they were in fact wrongfully terminated, are superior to those of their replacements." *McDermott*, 593 F.3d at 965. Thus, the balancing of the equities favors an injunction.

## D. Public Interest

"In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Frankl I*, 650 F.3d at 1365 (quotation marks omitted). "Moreover, the public interest favors applying federal law correctly. . . . Therefore, ordinarily when, as here, the Director makes a strong showing of likelihood of success and of likelihood of irreparable harm, the Director will have established that preliminary relief is in the public interest." *Small*, 661 F.3d at 1197 (simplified). The public interest factor supports granting the requested injunction.

## E. Equitable Doctrines

Respondent urges the Court to apply equitable doctrines to deny the requested injunction, particularly the unclean hands doctrine. Respondent essentially argues that the Union has

engaged in such bad conduct that the Court should, sitting in equity, should not provide any relief that benefits the Union. Respondent cites *Rivera-Vega v. ConAgra, Inc.*, 876 F. Supp. 1350, 1356 (D.P.R.), *aff'd*, 70 F.3d 153 (1st Cir. 1995), for the proposition that the Court "maintains some power to do equity." Respondent appears to overlook, however, that later in that opinion, the court in *Rivera-Vega* stated that "both the Board and the Courts have concluded that the 'clean hands' doctrine is not applicable to Board proceedings." Additionally, as discussed above, the Court disagrees with Respondent regarding the alleged dilatory and bad faith conduct by the Union. Thus, the Court declines to apply equitable doctrines requested by Respondent.

**F. Conclusion**

The Court finds that Petitioner has satisfied the four-part standard in *Winter* for preliminary injunctive relief. Petitioner has met his burden to show that he is likely to succeed before the Board on his claims that Respondent engaged and is continuing to engage in unfair labor practices in violation of §§ 8(a)(1), (3), and (5) of the NLRA. The relief requested by Petitioner is just and proper. Unless the Court grants interim injunctive relief, it can be fairly expected that Respondent will continue to repeat the acts and conduct discussed herein or engage in similar or like acts and conduct in violation of §§ 8(a)(1), (3), and (5) of the NLRA. It also can be fairly expected that, unless the aforesaid unfair labor practices are immediately restrained, a serious flouting of the NLRA will continue. This would thwart the enforcement of important provisions of the NLRA and the public policy underlying the NLRA, before a Board Order and a Court of Appeals enforcement decree can legally restrain Respondent. Further, unless Petitioner obtains interim injunctive relief, it may also be fairly expected that employees will permanently and irrevocably lose the benefit of the Board's processes and the exercise of statutory rights for the entire period required for Board adjudication, a harm that cannot be remedied in due course

by the Board. Respondent will continue in its unlawful conduct during the proceedings before the Board and during any later proceedings before a Court of Appeals, so that any Board Order or Court of Appeals enforcement decree will be a mere formality when issued, and Respondent will, by its unlawful acts and conduct, have frustrated the purposes of the NLRA. The Court, therefore, grants Petitioner's Amended Petition. The Court will issue the interim injunction by separate order.

## G. Relief Requested

Respondent argues that the relief requested is punitive. Specifically, Respondent argues that requiring it to read the injunction aloud violates Respondent's First Amendment rights, quoting *International Union of Electrical, Radio & Machine Workers v. NLRB*, 383 F.2d 230, 232-234 (D.C. Cir. 1967). The Ninth Circuit has expressly rejected this argument, specifically noting that the case quoted by Respondent has been "superseded" and is "irrelevant":

> CVMC nonetheless argues that the Board cannot remedy the chilling effect of CVMC's illegal activity with a reading order because doing so would humiliate management, relying on a Ninth Circuit dissent and two decades-old cases that have "clearly been superseded" by more recent decisions that have "approved a public reading requirement." *Conair Corp. v. NLRB*, 721 F.2d 1355, 1386 n. 99 (D.C. Cir. 1983) (enforcing reading order); *see J.P. Stevens & Co. v. NLRB*, 417 F.2d 533, 539 (5th Cir. 1969) (same). Setting aside this misplaced reliance on irrelevant cases, we fail to see why management's sensibilities should play any role in the determination of an appropriate remedy to address its illegal conduct. After all, "part of the medicine is the traditional acknowledgement that the employer has, but will not again, deny employees' rights." *J.P. Stevens*, 417 F.2d at 540. Nothing in the NLRA protects an employer from the embarrassment it might experience as a byproduct of the Board's remedy, as an employer's feelings are obviously "outweighed by the necessity of effectuating the policies of the National Labor Relations Act." *Id.* at 539.

*United Nurses Assocs. of Cal. v. NLRB*, 871 F.3d 767, 789 (9th Cir. 2017) (footnote citing *Int'l Union of Elec., Radio & Mach. Workers* as one of the superseded decades-old cases omitted).

Indeed, the Ninth Circuit explained that "a reading order is not an extraordinary remedy but rather an 'effective but *moderate* way to let in a warming wind of information and, more important, reassurance.'" *Id.* (emphasis in original) (quoting *UNFW., Inc. v. NLRB*, 844 F.3d 451, 463 (5th Cir. 2016)).

In its motion to amend, Respondent requests that the Court amend several aspects of the injunction. Respondent argues that the Court's injunction allows "unfettered" access by the Union, which does not return the parties to their status quo. The Court, however, merely ordered that the Union could require Respondent to rescind the unilateral changes it implemented, which returns the parties to status quo ante. The Court is not ordering any particular level of access.

Respondent also argues that the injunction should be amended not to include the two employees that Respondent found violated its policies during the strike. Petitioner does not dispute that those two employees are not included, but argues that the injunction is sufficiently clear without amendment because Petitioner stated in its Amended Petition that it was not seeking relief relating to the claims of those employees (and the Court noted this in footnote 3 of its May 7th Opinion and Order). The Court, however, finds that an amendment to the injunction would make the injunction clearer on this point. Accordingly, the Court amends the injunction to encompass this change.

Respondent further argues that the injunction should be amended not to include any employees who retired or took other jobs after the strike, or declined when Respondent made its original rehire offer. The parties did not reach agreement on this point. It is the Court's understanding that Respondent did not necessarily make its rehire offer to the same position or the same rate of pay as the striking employee had before the strike. The Court's injunction, however, requires Respondent to offer striking employees reinstatement to the same or

substantially equivalent position. Thus, Respondent's previous job offer may have been materially different, and an employee who turned it down or chose to retire may change his or her mind if offered his or her previous position. The Court declines to amend the injunction in this manner.[11]

Finally, Respondent requests that the injunction be amended so that the Union may not pick and choose what unilateral changes implemented by Respondent will be rescinded, and instead order that if the Union requests rescission, all the unilateral changes must be rescinded so that the parties are returned to the status quo ante. Respondent argues that by allowing the Union to choose, the Unit is placed in a better position than status quo ante because Respondent unilaterally implemented a 1% wage increase to offset the unilateral change to Respondent's health insurance. The Union selected all unilateral changes to be rescinded except the wage increase, placing Unit members back to the status quo ante as of April 30, 2020, except with the added benefit of a 1% wage increase.

Petitioner responds that the NLRB and courts routinely allow unions to pick and choose what unilaterally implemented changes to rescind, primarily relying on *California Pacific Medical Center v. NLRB*, 87 F.3d 304 (9th Cir. 1996). In that case, the Ninth Circuit affirmed the Board's final remedy "in cases of combined favorable and unfavorable unilateral changes, which is to order a return to the status quo ante with regard to the unfavorable changes, but to not penalize employees by ordering revocation of the favorable changes." *Id.* at 311. As Respondent points out, however, *California Pacific* involved the Board imposing a remedy after a hearing on the merits, not a 10(j) injunction, which is "to protect the lawful status quo while litigation is

_____

[11] The Union notes that this argument by Respondent has been rendered moot by the fact that Respondent made offers to those employees pursuant to the Court's original injunction and the employees turned down the offers of employment.

pending." *Frankl I*, 650 F.3d at 1342. The Court has reviewed the additional authority cited by Petitioner, and does not find it persuasive under the facts here. The parties specifically negotiated an increase in wages as a counter to the transfer of insurance, and no increase in wages if the insurance stayed with the OPET. Considering the equities in this case, and the objective of returning the parties to the status quo as of April 30, 2020, the Court finds that if the Union requests rescission of the unilateral changes while the litigation is pending, then it must be of all unilateral changes. The Court amends the injunction in this manner, as requested by Respondent.

## H. Stay Pending Appeal

### 1. Standards

A request for a stay pending appeal is committed to the Court's discretion. *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926). A party requesting a stay pending appeal "bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 433-34 (2009). In considering whether to exercise discretion by granting a motion to stay a preliminary injunction pending appeal, a court applies the familiar standard set forth by the Supreme Court in *Nken*, namely: (1) whether the movants-appellants have made a "strong showing" of the likelihood of success on the merits; (2) whether the movants will be irreparably injured absent a stay; (3) whether a stay will substantially injure other parties; and (4) where the public interest lies. *Id*. at 426. "The first two factors . . . are the most critical." *Id*. at 434. The Ninth's Circuit's "sliding scale" approach, in which "'the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another[,]' . . . applies to the consideration of stays pending appeal." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).

As further explained by the Ninth Circuit, *Nken* instructs "that if the petition has not made a certain threshold showing regarding irreparable harm . . . then a stay may not issue, regardless of the petitioner's proof regarding the other stay factors." *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011) (per curiam) (citing *Nken*, 556 U.S. at 433-34); *see also Al Otro*, 952 F.3d at 1007 (listing the *Nken* factors and explaining, "We *first consider the government's showing on irreparable harm, then discuss the likelihood of success* on the merits under the sliding scale approach" (emphasis added)); *see also Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020) (same). Moreover, in the context of a stay request, "simply showing some possibility of irreparable injury" is insufficient. *Nken*, 556 U.S. at 434 (simplified). Rather, at this juncture, "[t]he minimum threshold showing for a stay pending appeal requires that irreparable injury is likely to occur during the period before the appeal is likely to be decided." *Al Otro Lado*, 952 F.3d at 1007; *see also Doe #1*, 957 F.3d at 1059.

### 2. Irreparable Harm

Respondent argues that the striking and replacement workers will be irreparably harmed by the Court's injunction because under the expired CBA no worker will be eligible for the superior "regular" health insurance and all workers will have to take inferior "seasonal" coverage. Under the CBA, to be eligible for "regular" coverage, a worker must have worked 1,550 hours in the previous year and 80 hours in the previous month. Respondent asserts that due to the strike and the limited hours worked in 2020 by the replacement and striking workers, none of them worked 1,550 hours in 2020. Similarly, if rehired in May 2021 and added to the OPET, no returning striking employee worked the requisite 80 hours in April 2021. Respondent argues that the Court cannot order something contrary to the requirements of the CBA.

Respondent's argument is counter to its argument regarding the wage increase. Just as Respondent argued with respect to the wage increase, the point of a 10(j) injunction is for

workers to be returned to the status quo ante before the unfair labor practice—which would be as of April 30, 2020. This would mean placing striking workers to their April 30, 2020 status with respect to healthcare and would include their status as "regular" workers. Respondent's argument that the striking worker's status quo date is September 1, 2020, when the striking workers made their unconditional offer to return to work, or May 24, 2021, when they actually return to work, contradicts their previous argument and the purpose of the 10(j) injunction.[12]

Moreover, the Union argues that the OPET, Respondent, and the Union can easily sign a Memorandum of Understanding that Unit employees will be treated as "regular" workers for coverage after transitioning back to the OPET. The Union asserts that such agreements are not unusual in these situations so that returning workers can be covered under insurance plans that have a minimum hour requirement tied to the previous year or month. Counsel for OPET has offered to assist in preparing such an agreement and the parties have already started its drafting. Thus, Respondent fails to show that irreparable injury is likely to occur based on a lack of "regular" health insurance coverage for replacement and striking workers.

Respondent also argues in the irreparable harm section what appears to be a futility argument—that there is no point in entering an injunction requiring bargaining because the parties will simply reach impasse. Respondent states its "adamant position that its Final Offer is just that" and that it "will not change its position on its Final Offer." Although these statements do not bode well for the good faith bargaining ordered by the Court, the fact that Respondent does not appear to believe that bargaining will be successful does not make an order requiring

_____

[12] The Court also rejects Respondent's argument that the loss of "regular" employee status is due to the Union's negligence and because the Union stayed on strike. Petitioner has found that *Respondent* engaged in unfair labor practices by making unilateral changes without impasse and that the Union engaged in a lawful unfair labor practices strike. The Court has found that Petitioner met his burden to show likelihood of success on these claims.

good faith bargaining *irreparably harmful* to Respondent. Similarly, Respondent's arguments that the injunction will not solve or improve other legal issues pending before the Board is irrelevant to the Court's analysis for purposes of the requested stay about whether the injunction will cause irreparable harm to Respondent before an appeal can be heard. The Court instead considers these arguments when evaluating harm to others. Accordingly, Respondent fails to meet its burden of showing irreparable harm. At most, Respondent shows "some possibility of irreparable injury," which is insufficient. *Nken*, 556 U.S. at 434; *Leiva-Perez*, 640 F.3d at 965.

### 3. Strong Likelihood of Success

"Where, as here, the showing of irreparable harm is weak at best, the [movant] must make a commensurately strong showing of a likelihood of success on the merits to prevail under the sliding scale approach." *Al Otro*, 952 F.3d at 1010. Respondent fails to do so.

Respondent primarily argues that it is likely to succeed on its argument that the exception to impasse applies because of the Union's unreasonable delays. Respondent focuses on the Union's delays in providing bargaining dates and demand for in-person mediation. The Court has discussed why these arguments are not likely to succeed, particularly given the Court's standard of review in Section 10(j) cases. Respondent argues that the Court disregards material facts and misapplies the law. Respondent appears to have misconstrued portions of the Court's May 7th Opinion and Order, and the Court provides additional detail in this Amended Opinion and Order for clarification. The Court, however, simply does not accept all of Respondent's view of the facts and application of law. "[Respondent] unsurprisingly disagrees with the court's assessment of the evidence and its arguments, but disagreement with the court is not sufficient to show that there is a likelihood of success on appeal." *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 2013 WL 557102, at *6 (N.D. Cal. Feb. 12, 2013); *see also O.W. Bunker Malta Ltd. v. M/V Trogir*, 2013 WL 12131370, at *2 (C.D. Cal. Feb. 1, 2013) ("In short, Defendant may disagree

with the Court's ultimate conclusion, but disagreement alone does not establish a likelihood of success on the merits or even serious questions going to the merits of the case."). The Court finds that Respondent does not show that it is likely to succeed on appeal, let alone a "commensurately strong showing" sufficient to balance its weak showing on irreparable harm.

### 4. Remaining Factors

Considering the remaining factors, a stay will substantially injure the striking workers. As discussed in Section B, the Court finds that absent the injunction, the striking workers will be irreparably harmed. The Court also finds that a stay will substantially injure Petitioner and the national labor policy, as discussed in Section B. The Court is not persuaded by Respondent's arguments that because the injunction does not resolve all pending legal disputes, it does not address any irreparable harm to the national labor policy. The injunction is also in the public interest, as discussed in Section D.

## CONCLUSION

The Court GRANTS IN PART Respondent's Motion to Stay Preliminary Injunction Pending Appeal or to Amend Preliminary Injunction (ECF 56). The Court denies the motion to stay and grants in part the motion amend. The Court amends its Opinion and Order and GRANTS Petitioner's Amended Petition (ECF 21) for preliminary injunctive relief under § 10(j) of the National Labor Relations Act. The Amended Order Granting Interim Injunctive Relief is filed concurrently herewith.

**IT IS SO ORDERED**.

DATED this 26th day of May, 2021.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge